Christopher Justin Eads
Reg. No. 10392-028
Federal Correctional Institution
P.O. Box 420
Fairton, NJ 08320
**Pro se**



RECEIVED
OCT - 6 2021
AT 8:30
WILLIAM T. WALSH
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTOPHER JUSTIN EADS,<br>        Plaintiff,<br><br>        v.<br><br>UNITED STATES OF AMERICA,<br>HSA C. HANSEN,<br>WARDEN BERGAMI,<br>LIEUTENANT WIELER,<br>UNKNOWN LIEUTENANT,<br>COUNSELOR FREEMAN,<br>        Defendants. | No.  1:21-cv-17369-RMB-MJS<br><br>**FIRST AMENDED<br>VERIFIED COMPLAINT<br>BY PRISONER** |

## I.  JURISDICTION

1.  Jurisdiction of this Court, over the United States of America is invoked pursuant to 28 U.S.C. §1346; Federal Tort Claims Act.

2.  Jurisdiction of this Court, over HSA C. Hansen, Warden Bergami, Lieutenant Wieler, unknown Lieutenant, and Counselor Freeman, in their individual and official capacities for the constitutional violations is invoked pursuant to Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 338 (1971); 28 U.S.C. §1331.

## II.   PARTIES

3.  Plaintiff, Christopher Justin Eads, at all relevant times was

1

incarcerated at Federal Correctional Institution - Fairton, New Jersey.

4. Defendant, United States of America, at all relevant times employed staff at Federal Correctional Institution - Fairton, New Jersey.

5. Defendants, HSA C. Hansen, Warden Bergami, Lieutenant Wieler, unknown Lieutenant, and Counselor Freeman, at all relevant times were employed at Federal Correctional Institution - Fairton, New Jersey.

## III.    PREVIOUS LAWSUITS

6. Plaintiff filed a suit in the U.S. District Court for the Southern District of Indiana, Evansville Division, Case No. 3:18-CV-00190-RLY-MPB.

7. Plaintiff filed a suit in the U.S. District Court of the District of Colorado, Case No. 17-CV-02476-GPG.

8. Plaintiff filed a suit in the U.S. District Court for the District of Arizona, Case No. 4:20-CV 00019-JGZ.

9. Plaintiff filed a suit in the U.S. District Court for the District of New Jersey, Case No. 1:19-CV-1894-NHL-JS.

## IV.    ADMINISTRATIVE REMEDIES

10. Plaintiff has fully exhausted both informal and formal resolution through the BOP's administrative remedy and appeals program.

## V.    RELEVANT FACTS

11. On March 26, 2020, the BOP implemented Phase 4 of its COVID-19 pandemic response.

12.    Phase 4 required staff entering FCI Fairton to be screened and temperature checked.

13.    On or about April 16, 2020, the BOP initiated a mandatory requirement that all staff and inmates wear masks covering both their nose and mouth.

14.    A message played on the overhead speaker system at the beginning of each shift (3 times per day) reminding staff and inmates to wear their masks, to maintain proper social distancing and sanitation, including disinfection of regularly touched surfaces.

15.    On numerous occasions between April 16, and on or after May 21, 2020, B-Left Counselor Freeman and several other unit officers failed to properly wear their masks, either having their nose exposed or both their nose and mouth (mask under their chin).

16.    On, before or after May 31, 2020, but before June 14, 2020, Counselor Freeman and other staff that routinely worked B-Left Unit tested positive for COVID-19 and introduced it into the inmate population of B-Left Unit.

17.    Counselor Freeman on numerous occasions spoke face-to-face with inmates in B-Left, including Eads, without honoring social distancing (6 foot requirement) and without a mask properly

3

covering his mouth and nose.

18.    Counselor Freeman and other B-Left Unit staff failed to properly provide or enforce sanitation (disinfection) of Unit telephones, computer keyboards and mouse, along with other areas of the unit between inmate usage.

19.    The institution allowed or required officers to continually work different units. Officers would work B-Left for a day, maybe several days, then work other units such as A-Right, A-Left, B-Right, C-Right, C-Left, D-Right.

20.    Several of these officers tested positive for COVID-19 who worked in Eads' Housing Unit, B-Left; including Counselor Freeman.

21. Medical staff informed Eads and other inmates that the Institution was not testing staff for COVID-19, only requiring them to obtain their own test if they desired (not mandatory) and report the results if such testing was conducted.

22.    On or about June 14, 2020, Eads contracted COVID-19.

23.    Sometime after contracting COVID-19, Eads began suffering breathing complications, whereas, Eads experienced trouble taking in deep breaths of air which resulted in him becoming light-headed, dizzy, seeing spots in his vision, and becoming faintish.

## CAUSE OF ACTION

A.    Negligence of the United States by and through B-Left Unit Counselor Freeman and other B-Left Unit Staff.

     i.    18 U.S.C. §4042 establishes that the United States has a

4

           duty to provide safekeeping for anyone convicted of crimes against it.

ii.  The United States breached its duty when it failed to: (1) provide regular COVID-19 testing for all staff entering FCI Fairton to prevent the introduction of COVID-19 into the institution; (2) enforce the requirement that all staff wear face masks properly and honor social distancing; (3) enforce proper sanitation and disinfection of housing units; and (4) limit the number if Unit Officers which rotated in and out of B-Left housing unit.

iii. On, before, or after May 31, 2020, but before June 14, 2020, Counselor Freeman and other B-Left Unit Staff contracted COVID-19 and introduced it into the inmate population of B-Left housing unit.

iv.  As a result of Counselor Freeman and other Unit Staff introducing COVID-19 into the inmate population of B-Left unit, Eads contracted COVID-19 and subsequently begun suffering from breathing complications; such as trouble taking deep breaths which resulted in him becoming light-headed, dizzy, seeing spots in his vision, and becoming faint.

24.  On September 6, 2020, Eads submitted his first medical sick call request to Health Services (H.S.) seeking medical attention for his COVID-19 breathing complications. Whereas, Eads stated: "I have been having difficulties breathing after contracting

COVID-19. My chest hurts when I take a full breath; to the point I am becoming light-headed and faintish."

25.   H.S. never responded or evaluated Eads for his September 6th sick call request.

26.   On September 16, 2020, Eads submitted a second sick call request to H.S. stating: "this is my second request for COVID-19 breathing issues I am experiencing. It hurts to breathe hard and I am constantly light-headed and dizzy."

27.   H.S. never responded or evaluated Eads for his September 16 sick call request.

28.   On September 23, 2020, Eads submitted a third sick call request to H.S. stating: "I have submitted several medical cop outs over the past two (2) weeks over COVID-19 health issues I am having. I am still continuing to have breathing issues." And "please review my medical sick call request(s). I need medical attention..."

29.   H.S. never responded or evaluated Eads for his September 23 sick call request.

30.   On September 24, 2020, Eads submitted his first email message to H.S. stating: "Since contracting COVID-19 several months ago. I have been having very difficulties breathing." And "I submitted a medical cop out several days ago to Health Services, but I have not been notified or seen..."

31.   H.S. never responded or evaluated Eads for his September 24 email sick call request.

32.   Also on September 24, 2020, Eads submitted a fourth sick call request to H.S. stating: "Since contracting COVID-19, I have

6

been having serious breathing issues." And "I am in pain and cannot breathe to full capacity."

33. H.S. never responded or evaluated Eads for his September 24 sick call request.

34. On September 25, 2020, Eads submitted a second email message to H.S. stating: "Could you please respond and let me know about how I can receive health care in this matter, I cannot breathe." And "I have submitted sick calls with no response."

35. On September 28, H.S. responded by email stating: "You are scheduled for a sick call in the very near future."

36. On September 29, 2020, Eads experienced trouble breathing while taking a shower; upon returning to his cell, Eads became light-headed and dizzy; whereas, he fainted. The incident was witnessed by Eads' cellmate, Greg Berry.

37. On October 1, 2020, Eads submitted a third email message to H.S. stating: "...it has now been a week since you said I would be seen by medical for my breathing problems due to COVID, and as of today, nothing." And "I fainted/passed-out on 9/29/2020..." And "... again, for the fifth (5th) request and time over the past month; please get me into medical today."

38. H.S. never responded or evaluated Eads for his October 1 email sick call request.

39. On October 2, 2020, Eads submitted a fourth email message to H.S. stating: "This is now my sixth request for emergency heath care; Please get me to emergent evaluation, care and treatment today!!!"

40. H.S. never responded or evaluated Eads for his October 2

email sick call request.

41.   Also on October 2, 2020, Eads, for the second time, experienced difficulties breathing, becoming light-headed, dizzy and seen spots; whereas, Eads again fainted. The incident was witnessed by several inmates.

42.   On October 3, 2020, Eads submitted a sick call request to H.S. notifying them of his continual fainting spells and his COVID related breathing issues; stating: "I have now fainted/passed-out twice now in the last week due to my breathing issues of COVID-19, medical refuses to provide me any medical attention. I am afraid I am going to be injured by these fainting spells. Please help."

43.   H.S. never responded or evaluated Eads for his October 3 sick call request.

CAUSE OF ACTION

B.   Negligence of the United States by and through BOP staff.

    i.   18 U.S.C. §4042 establishes that the United States has a duty to provide care for anyone convicted of crimes against it.

    ii.   The United States breached its duty when it failed to provide care for 30 days after Eads reported COVID-19 complications through 5 paper sick call and four email sick call requests.

    iii.   On September 6th, 16th, 23rd, 24th, and October 3rd Eads sent paper sick call requests to medical, and on

8

September 24th, October 1st, 2nd, and 3rd he sent email requests informing BOP staff of his breathing complications, light-headedness, and dizziness he experienced after contracting COVID-19.

iv.    As a result of BOP staff waiting 30 days to provide care to Eads for COVID-19 complications, he fainted on September 29th and October 2nd, 2020. The fainting spells are reasonably related to the BOP's failure to provide care to Eads.

44.    On October 6, 2020, H.S. conducted an evaluation of Eads for his COVID-19 complaints, whereas, it was documented that Eads: "States he feels like he can't get a full breath in. Feels like breathing through a straw. Admits to discomfort associated with breathing., Worsening symptoms when lying down. Sometimes worse than others, comes and goes... worse with exercise... states he fainted in his room 10/2 (Friday). Light-headed, dizzy, seeing spots, states he collapsed onto the floor, remembered how it happened, denies losing consciousness." H.S. documented Eads' blood pressure value as "142/68", and advised him it was somewhat "high". Additionally, the H.S. encounter resulted in "chest x-rays" being taken of Eads' lungs and ended with a "follow-up at sick call as needed".

45.    On October 7, 2020, Eads submitted an email message to H.S. to follow-up with his continual breathing complications and his previous high blood pressure results stating: "Yesterday I was seen by Health Services for COVID related breathing problems I am

having with my ability to breathe. My blood pressure was high..." And "Could you please provide me with care and treatment for my COVID related breathing condition(s), because I only received an 'evaluation' yesterday at Health Services???" and "my breathing conditions and pain and suffering have not been addressed or cared for or treated..."

46. On October 12, 2020, H.S. conducted a "follow-up visit" regarding the results of Eads' chest x-rays taken on "10/6/2020". Whereas, H.S. documented the Eads: "states he still feels like he can't get full breath. Denies any changes since last visit." And Eads was advised that his chest x-rays appeared "normal".

47. Also on October 13, H.S. provided Eads with a blood draw for lab testing due to his COVID related breathing issues. H.S. advised Eads that he would be contacted upon completion of his lab tests.

48. On October 16, 2020, Eads submitted a sick call request to H.S. stating: "my chest hurts to take a deep breath of air, I need a follow up with medical. I am seeing spots in my vision and my ears are ringing. I am really messed up."

49. On October 20, 2020, H.S. advised Eads and documented him as being "identified as possible exposure" to "COVID-19" for a second time. However, on or about November 4, 2020, Eads' test results came back as "negative".

50. H.S. never responded or evaluated Eads for his October 16 sick call request.

51. On November 22, 2020, H.S. conducted a "follow-up visit" regarding the results of Eads' blood draw "lab test" taken

10

October 13. Whereas, H.S. documented Eads; "...also reports shortness of breath since he was diagnosed with COVID-19 five months ago." Eads' lab results "reveal anemia with Hg of 12.7, which could possibly be related to SOB." And "Glucose level of 125 on recent labs. Patient unsure if he was fasting..." The H.S. encounter ended with a "Follow-up at sick call as needed."

52.   On November 22, 2020, Eads submitted an email request to H.S. upon his return from his follow-up "anemia" diagnosis and his high "glucose levels" documentation. Whereas, Eads requested care and treatment for his COVID related breathing conditions and related diagnoses.

53.   On November 22, H.S. responded by email message, stating: "if you are having medical concerns, please follow sick call protocol - submit a hand written sick call to be scheduled with a provider."

54. On November 23, 2020, Eads followed H.S.'s email instruction from November 22; he filed a medical sick call request to H.S. requesting care and treatment for his diagnosed anemia, high glucose levels and subsequent COVID-19 breathing issues.

55.   H.S. never responded or evaluated Eads for his sick call request.

56.   On December 8, 2020, H.S. conducted a second blood draw "lab test" in order to re-check Eads' previous "10/13/2020" lab test. In addition to his lab test, H.S. documented: "inmate here for lab work and c/o to PA that he sees spots and feels like he's going to pass out." And "inmate states that ever since he was dx with COVID-19 he's been having SOB, dizziness, headaches, feels

11

like his BP is elevated." A check of Eads' blood pressure revealed a "148/89" value. And it was further documented that: "review BP and inmate placed on weekly BP checks for monitoring." And "Return immediately if condition worsens."

57.   On December 16, 2020, H.S. came to Eads' housing unit to check his "blood pressure" as scheduled on "12/8/2020". Whereas, Eads' blood pressure revealed a value of "197/73", and was documented and advised that his blood pressure was extremely high.

58.   Also on December 16, 2020, and after his blood pressure check, Eads email messaged H.S. to request emergency blood pressure care and treatment, stating he was "still having extreme headaches, dizziness, light-headedness, tiredness and I am still faintish and passing out at times due to issues (among other injuries and traumas medical is already aware of); and the fact I still cannot breathe fully. It hurts."

59.   On December 17, 2020, H.S conducted a "follow-up visit" with Eads for his high blood pressure checks. Whereas, Eads was diagnosed with having "Hypertension" due to COVID-19 aftereffects. And Eads continued to report shortness of breath and that he fainted a few days prior. Eads' H.S. encounter ended with a diagnosis of Hypertension and Eads was to be placed on "Lisinopril 20 mg" medication to control his blood pressure.

60.   Also on December 17, H.S. conducted a secondary "follow-up visit" with Eads regarding the test results of his "12/8/2020" blood draw. Whereas, it was documented that: "3) Labs reviewed. $A_1C$ 5.2%. Discussed that Patient is not diabetic. Patient reports

understanding. 4) Anemia resolved. hemoglobin level within normal limits at 14.0 after previously being 12.7 on 10/13/20. Iron studies, vitamin B12, and Folate were within normal limits. Patient reports understanding. 5) AST slightly elevated at 57 on 10/13/20."

61. On December 19, 2020, Eads submitted an email message to H.S. complaining about the two (2) conflicting lab test results from "10/13/20" and "12/8/20". Whereas, Eads stated: "... I was advised that my second recent blood work was in direct conflict with my first blood test results. I had two lab tests completed within a month and a half of each other, and both showed different levels, my first test results showed that I had 'anemia' and high 'glucose', among other abnormalities. My second test results showed that I DID NOT have 'anemia' or high 'glucose'... Based on these very close in timing lab test results; I am hereby requesting a third blood test result to ensure and confirm either the first or second test results."

62. H.S. never responded or evaluated Eads' blood draw request email message from 12/12/20.

63. On December 22, 2020, Eads submitted a sick call request to H.S. stating: "I have had two (2) blood draws... one shows I have 'anemia' and high 'glucose' levels, the other is normal. I now request a third blood draw..." And "I was advised by medical I need to be on blood pressure medication."

64. H.S. never responded or evaluated Eads nor was Eads ever provided a third blood test.

65. On December 28, 2020, Eads submitted a sick call request to

13

H.S. stating: "I would like to request a third 'lab test' on my blood to be conducted; as my last two lab tests were in conflict with each other. There were serious medical concerns with my first lab test results..." And "I am supposed to be prescribed blood pressure medication by medical, but have yet to receive any."

66. On December 29, 2021, Eads submitted a sick call request to H.S. stating: "I would like to know when I am going to be put on the blood pressure medication I was told several weeks ago would be prescribed for my high blood pressure. I am still having side effects.."

67. On December 31, 2020, Eads submitted an Administrative Remedy request seeking medical attention for his diagnosed "anemia" and high "glucose" levels and requesting a third blood draw.

68. On January 3, 2021, Eads submitted a sick call request to H.S. stating: "I have COVID-19 related breathing problems. I cannot get air in and out. I must take slow, shallow breaths..." And "I get light-headed and faintish..."

69. H.S. never evaluated Eads for his sick call request; but stated later: "Patient evaluated for same complaint 12/17/2020".

70. On January 4, 2021, Eads submitted a sick call request to H.S. stating: "This is now my fourth request: 1) PA, Knowles told me a month ago he was going to start me on two (2) blood pressure medications for my constant high blood pressure since contracting COVID-19; but still nothing." And "2) I need a third blood test... PA Knowles diagnosed me with 'anemia', among other

14

things, then purported that I am now fine and he 'misdiagnosed' me".

71. H.S. never responded to Eads' "1/4/2021" sick call request.

72. On January 6, 2021, Eads submitted an email message to H.S. stating: "...I have been actively and persistently seeking... my blood pressure medication for a month now..."

73. On January 10, 2021, Eads submitted a sick call request to H.S. stating: "I need a third blood draw to determine my COVID injuries and a plan of care and treatment... I cannot hardly breathe."

74. On January 11, 2021, H.S. responded to Eads' email message requesting his blood pressure medication stating: "Your medications were filled on 12/21/2020. they are available to you during mainline. If you do not retrieve them in a timely manner, they are restocked."

75. On January 13, 2021, H.S. conducted a "follow up visit" with Eads regarding his "Lisinopril" blood pressure medication. Whereas, it was documented that: "Patient also states that ringing in his ears subsided and 'spots' in his vision has resolved since starting Lisinopril." But "Patient also reports shortness of breath for the past 7 months... since positive COVID-19 diagnosis..."

## CAUSE OF ACTION

C. Medical malpractice of the United States by and through HSA C. Hansen and other medical staff.

    i. The applicable standard of care when a patient exhibits

15

high blood pressure is to frequently monitor his blood pressure and prescribe medication to control the blood pressure if it continually registers high.

ii. The United States deviated from the standard of care when: 1) On October 6th H.S. registered Eads' blood pressure at 142/68, on October 7th Eads requested a follow-up with regards to his high blood pressure, on October 16th Eads reported seeing spots, on December 8th H.S. reqistered Eads' blood pressure at 148/89 and ordered weekly blood pressure checks, on December 16th H.S. registered Eads' blood pressure at 197/73, on the same day Eads requested treatment for his high blood pressure and reported that he has passed out, had extreme headaches, dizziness, light-headedness and tiredness, and on December 17th H.S. saw Eads, wherein he reported fainting and H.S. diagnosed him with "hypertension" and told him he would be put on "Lisinopril"; and 2) On December 22nd, 28th, 29th, January 4th, and 6th Eads inquired about and requested that he be provided the prescribed Lisinopril, and H.S. waited until January 11th to tell Eads his prescription had been filled on 12/21/20, and would be restocked if he did not pick it up.

iii. The United States' deviation from the standard of care was the proximate cause of Eads' high blood pressure worsening as it went uncontrolled, resulting in fainting, and pain and suffering.

16

D.  Medical malpractice of the United States by and through HSA C. Hansen and other medical staff.

   i.   The applicable standard of care when two blood labs produce conflicting results, one showing that the patient has anemia and high glucose levels, and the second showing normal results would be to order a third blood lab to confirm the results of either.

   ii.  The United States deviated from the standard of care when: 1) H.S. conducted a blood lab on Eads and on November 22nd diagnosed him with anemia and high glucose levels; on November 22nd and 23rd Eads requested treatment for his diagnosis; on December 8th, H.S. conducted a second blood lab; on December 17th, H.S. informed Eads that he was not diabetic and his anemia was resolved; on December 19th, 22nd, 31st, January 4th, and 10th, Eads requested a third blood lab to confirm the results of either the October 13th or December 8th blood lab;

   iii. The United States' deviation from the standard of care proximately caused complication of anemia such as shortness of breath, and high glucose levels.

E.  Medical malpractice of the United States by and through HSA C. Hansen and other medical staff.

   i.   The applicable standard of care when a patient reports

17

breathing complications as a result of COVID-19 is to evaluate the patient and prescribe a course of treatment;

ii.  The United States deviated from the standard of care when: on October 7th, Eads requested a follow-up with H.S. for breathing complications after contracting COVID-19; on October 13th, H.S. told Eads a chest x-ray came back normal; on November 23rd Eads reported that it hurt him to take full breaths; on January 3rd, Eads reported breathing issues and that he was getting light-headed and dizzy; on January 13th, Eads requested a follow-up for seven months of shortness of breath.

iii. The United States' deviation from the standard of care was the proximately caused Eads' breathing complications to continue and worsen by not responding to his requests for medical attention or prescribing a course of treatment.

76.  On January 27, 2021, Eads was instructed to report to H.S. immediately for an unscheduled visit.

77.  Upon Eads' arrival to H.S. on January 27, he was met by Health Service Administrator (HSA) C. Hansen (Hansen), who took him into her private office and shut the door behind him.

78.  Upon sitting down in a chair, Eads immediately asked Hansen if he was there for a medical encounter per his sick call and email requests.

79.  Immediately upon sitting behind her desk, and after Eads'

inquiry about the nature of his presence there, Hansen began to curse and verbally abuse Eads telling him, "I do not care how many requests and emails you submitted for medical attention; your ass will not receive any further medical attention. Now or ever."

80. Hansen then threatened to place Eads in the Special Housing Unit (SHU) and have him transferred to another institution if he filed another medical sick call or email request, seeking any form of medical attention for any reason.

81. Due to the stressful confrontation by Hansen, Eads begun to suffer a panic/anxiety attack (Eads has a documented history of anxiety attacks). Whereas, Eads began to hyperventilate, experience trouble breathing and started to shake and cry due to the pain of the attack.

82. Hansen witnessed Eads' panic/attack occurring.

83. Hansen did not provide or seek any medical attention for Eads; instead she continued to verbally abuse and threaten Eads with punishment of placement into the SHU and transfer to another institution if he ever attempted to seek medical attention again, even though she had knowledge and understanding he was suffering a panic/anxiety attack at that moment of time.

84. Eads then requested medical attention by or through Hansen as the HSA for his panic/anxiety attack.

85. Hansen continued to abuse Eads verbally; at which time Eads tried to exit Hansen's office. Hansen physically forced the door out of Eads' hand and shut it again, placing herself between him and the door, as to keep Eads confined in her office during his

19

medical duress.

86.    Eads then requested Hansen call a lieutenant due to the confrontation and his duress.

## CAUSE OF ACTION

F.    HSA C. Hansen was deliberately indifferent to Eads' serious medical need.

i.    Eads had a serious medical need, as he reported on numerous occasions up to January 27th, 2021, and exhibited on the same day during an unscheduled visit with HSA C. Hansen. These medical needs were reported as breathing issues, light-headedness, dizziness, and fainting spells after contracting COVID-19;

ii.    HSA C. Hansen was deliberately indifferent to Eads' serious medical need as: 1) she called him to her private office for an unscheduled visit on January 27th; 2) closed the door behind him; 3) when he asked if he was there for a medical encounter per his sick call and email requests Hansen began to curse and verbally abuse Eads telling him "she did not care how many requests and emails he submitted for medical attention his 'ass' would not receive any further medical attention. Now or ever."; 4) Hansen threatened to place Eads in the SHU and have him transferred to another institution if he filed another sick call or email requesting any form of medical attention for any reason; 5) when Eads had a

20

panic/anxiety attack during the meeting, exhibited trouble breathing, and asked for medical attention Hansen continued to abuse him verbally; 6) when Eads attempted to leave her office, Hansen physically forced the door out of his hand and shut it; and 7) instead of seeking medical attention for Eads, Hansen continued with threats of SHU placement and transfer to another institution.

iii. Hansen's actions were deliberately indifferent because she intentionally refused to provide care, delayed medical treatment for non-medical reasons, and denied reasonable requests for treatment that resulted in Eads suffering the risk of further injury and pain.

iv. Hansen knew of and disregarded the excessive risk to Eads' health. She was both aware of facts from which she could draw inferences that substantial risk of harm existed and also drew those inferences as she was the Health Services Administrator and saw Eads hypertventilating, experiencing trouble breathing, and shaking and crying due to the pain of the attack.

G. Intentional Infliction of Emotional Distress of the United States by and through HSA C. Hansen.

i. On January 27, 2021, HSA C. Hansen called Eads for an unscheduled visit to castigate him for his repeated requests for medical attention. When Eads inquired

21

whether he was there to receive medical attention for his repeated requests, HSA C. Hansen acted intentionally or recklessly in deliberate disregard of a high probability that her actions would result in Eads' emotional distress wherein: 1) she verbally abused Eads, telling him "I do not care how many requests and emails you submit for medical attention; your ass will not receive any further medical attention. Now or ever."; 2) She threatened to place Eads in the SHU and have him transferred if he filed another medical sick call or email request seeking any form of medical attention for any reason; 3) When she witnessed Eads exhibiting physical symptoms due to his emotional distress she did not provide or seek medical attention for Eads. Instead she continued to verbally abused and threaten him with the SHU and transfer; and 4) When Eads attempted to disengage by exiting her office she forced the door out of his hands, shutting it, and placing herself between him and the door.

ii. As a result of HSA C. Hansen's actions Eads, suffered severe emotional distress which manifested itself in physical symptoms of hyperventilating, breathing trouble, shaking, and crying.

87. Several minutes later, Lieutenant Wieler arrived at Hansen's office; where he too witnessed Eads' panic/anxiety attack occurring. Lieutenant Wieler

22

specifically witnessed, Eads hyperventilating, having trouble breathing, and shaking and crying due to the pain from the attack.

88. Eads verbally reported to Lieutenant Wieler, that he required medical attention at the very moment he was having the panic/anxiety attack.

89. Lieutenant Wieler ordered Eads up from his chair he was seated. Whereas, upon standing, Eads almost fell down. Whereafter, Eads had to be supported by the wall to steady himself.

90. Lieutenant Wieler ordered Eads away from Hansen's office, out of the H.S. wing, and into the Lieutenant's office.

91. During the walk to the Lieutenant's office, Lieutenant Wieler stated to Eads to stop leaning on the wall for support, that Eads was "fine" and ordered him to walk faster.

92. Upon entering the Lieutenant's office, Lieutenant Wieler told Eads that everything Hansen said to him was correct; he would be given an incident report for "harassment of staff" if he ever filed another sick call or medical email request seeking medical attention for any reason; that he would be sent to the SHU and transferred to another facility.

93. Lieutenant Wieler told Eads that "a guy like you will not do well in the SHU".

23

## CAUSE OF ACTION

H.  Lieutenant Wieler was deliberately indifferent to Eads' serious medical need.

i.  Eads had a serious medical need, as on January 27th, 2021, he suffered a panix/anxiety attack wherein he hyperventilated, exhibited trouble breathing and pain from the attack.

ii.  Wieler was deliberately indifferent to Eads' serious medical need as; 1) he witnessed Eads hyperventilate, exhibit trouble breathing and the pain caused by the attack; 2) Eads verbally reported to him that he required medical attention at that very moment; 3) Eads almost fell down and had to steady himself on the wall; 4) Wieler told Eads to stop leaning on the wall "you're fine" and ordered Eads to walk faster; 5) Wieler told Eads that everything Hansen said to him was correct and he would be given an incident report for "harassment of staff" if he ever filed another sick call or medical request seeking medical attention for any reason, would be sent to the SHU, and transferred to another facility; 6) Wieler told Eads that "a guy like you will not do well in the SHU."; and 7) instead of seeking medical attention for Eads, Wieler continued with the same threats that Hansen made of SHU placement and transfer to another facility.

iii. Wieler's actions were deliberately indifferent because

24

he intentionally refused to provide care, delayed medical treatment for non-medical reasons, and denied reasonable requests for treatment that resulted in Eads suffering the risk of further injury and pain.

iv. Wieler knew of and disregarded the excessive risk to Eads' health. He was both aware of facts from which he could draw inferences that substantial risk of harm existed and also drew those inferences because he saw Eads hyperventilate, have trouble breathing, and shaking and crying from the pain of the attack.

94. On January 28, 2021, Eads personally hand delivered a "sensitive" Administrative Remedy request to Warden Bergami regarding the threats made by HAS Hansen and Lieutenant Wieler on January 27th, and his need for medical attention. And made him personally aware of the situation(s).

95. On January 31, 2021, at approximately 6:00pm, while taking a shower, Eads experienced difficulties breathing, saw spots, got light-headed and dizzy and subsequently lost consciousness, passing out. As he lost consciousness, Eads hit his face/head on an unknown fixture/object of the shower.

96. After an unknown amount of time, approximately 30-45 minutes, Eads regained conscienceness. Eads wokeup laying on the shower floor; with blood on parts of his left arm and left chest area. Eads' head hurt by touch, his vision was foggy, he had a headache, he was nauseous and could not immediately remember what had occured.

25

97. After several minutes (10-15 minutes), Eads was able to compose himself with his motor functions; get semi dressed; and stumbling, make his way to his cell.

98. Eads ultimately rested in his cell for an unknown amount of time. Whereafter, Eads checked his head area in the mirror due to pain occurring from that area. Eads immediately noticed he had a cut and large knot on the left side of his head, which was still freely bleeding.

99. Eads cleaned up his head injury and placed bandages on it.

100. Due to HSA Hansen's and Lieutenant Wieler's January 27th threats and Eads' fear of punishment, he did not directly submit a sick call or email request to H.S. for his medical injuries, nor notify the unit officer.

101. However, on February 1, 2021, Eads hand delivered a second "sensitive" Administrative Remedy request personally to Warden Bergami regarding his January 31th medical duress situation in the shower. Further, Warden Bergami personally witnessed Eads' head trauma and injuries, as Eads removed his bandages and showed him visible injuries. Whereas, Eads requested medical attention and advised Warden Bergami that he was not allowed to file a sick call or medical email message due to the threats of punishment. Warden Bergami took Eads' "sensitive" Administrative Remedy request from him, but did not seek medical attention for Eads.

102. On February 4, 2021, Eads sent an email message to Warden Bergami to follow-up about fainting in the shower, informed him again of the injuries and the need for medical attention. Warden Bergami never responded to the February 4th email message.

26

103. On February 6, 2021, Eads made a phone call to his family informing them of the medical duress he fell under on January 31st. Eads' conversation was indicative of signs of speech impairment. Eads was not able to form words or complete coherent sentences during this phone call which worried his family.

104. About 30 minutes after Eads concluded his telephone call, he was instructed to report to the Lieutenant's Office; wherein, Eads was questioned by a Lieutenant about the telephone call he had just made to his family. The Lieutenant on duty advised Eads that he had monitored his telephone conversation and needed to document the incident and extent of his visual injuries. The Lieutenant took several photographs of Eads' head trauma and injuries and made a report.

105. Eads requested the Lieutenant seek medical attention for him because he was afraid to file medical sick call or email message requests due to the threats previously made by HSA Hansen and Lieutenant Wieler. However, the Lieutenant sent Eads back to his housing unit without seeking him medical attention for the visible injuries documented by the Lieutenant.

106. On February 8, 2021, Eads filed an additional Administrative Remedy request seeking medical attention for his head trauma and injuries from the January 31st shower fall, since he could not do so by medical sick call request.

107. In response to the Administrative Remedy, Warden Bergami told Eads to seek medical attention through the medical department, despite the known threats by HSA Hansen and Lieutenant Wieler.

27

108.   As of today, Eads continues to experience, at times, shortness of breath, chest tightness, uncontrolled headaches, light-headedness, dizziness, faintishness, memory loss and fatigue. Eads continues to desire to seek medical attention directly, but is afraid to do so. And Eads would seek medical attention if allowed.

## CAUSE OF ACTION

I.   Warden T. Bergami was deliberately indifferent to Eads' serious medical needs.

   i.   Eads had a serious medical need as he was experiencing breathing issues, light-headedness, dizziness, and fainting spells after contracting COVID-19, and suffered head trauma after experiencing difficulties breathing, seeing spots, getting light-headed, dizziness and losing consciousness in the shower, hitting his head and suffering trauma and injuries.

   ii.   Warden T. Bergami was deliberately indifferent to Eads' serious medical needs as: 1) On January 28th Eads personally delivered a "sensitive" administrative remedy making Bergami personally aware of Eads' breathing issues, light-headedness, dizziness, and fainting spells after contracting COVID-19 and the threats made by HSA C. Hansen and Lieutenant Wieler on January 27th; 2) On February 1st Eads personally delivered a "sensitive" administrative remedy making Bergami personally aware

28

that Eads was experiencing difficulty breathing, saw spots, got light-headed, dizzy, and lost consciousness in the shower hitting his head, suffering trauma and injuries; 3) on February 1st, Eads showed Bergami his head trauma and injuries; 4) on February 4th Eads sent a follow-up email to Bergami informing him again of the injuries and the need for medical attention; 5) on February 8th, Eads filed an administrative remedy seeking medical attention for his head trauma and injuries from his January 31st fall in the shower; and 6) Bergami ignored Eads February 4th email and later informed Eads to file requests for medical attention with the medical department, despite knowing the threats already made by HSA C. Hansen and Lieutenant Wieler.

iii. Bergami's actions were deliberately indifferent because he delayed medical treatment for non-medical reasons, and denied reasonable requests for treatment that resulted in Eads suffering the risk of further injury and pain.

iv. Bergami knew of and disregarded an excessive risk to Eads' health. He was both aware of facts from which he could draw inferences that substantial risk of harm existed and also drew those infernecs because he was personally made aware of Eads breathing issues, light-headedness, seeing spots, dizziness and passing out, and personally saw Eads' injuries from the fall.

J. Unknown Lieutenant was deliberately indifferent to Eads

29

medical need.

i.   Eads had a serious medical need as he had experienced difficulties breathing, saw spots, got light-headed, dizzy, lost consciousness in the shower, fell and hit his head suffering head trauma and injuries.

ii.  Unknown Lieutenant was deliberately indifferent to Eads' serious medical need as: 1) on February 6th the Lieutenant listened to Eads' phone call with Eads' family, wherein his speech was impaired, Eads was unable to formulate words or complete coherent sentences; 2) after the phone call, unknown Lieutenant called Eads to his office questioning Eads about his injuries, taking several photographs and making a report; 3) Eads complained of pain and asked for medical attention; and 4) the Lieutenant, instead of seeking medical attention for Eads sent him back to his housing unit.

iii. Unknown Lieutenant's actions were deliberatel indifferent because he intentionally refused to provide care, delayed medical treatment for non-medical reasons, and denied reasonable requests for treatment that resulted in Eads suffering the risk of further injury and pain.

iv.  Unknown Lieutenant knew of and disregarded excessive risk to Eads' health. He was both aware of facts from which he could draw inference that substantial risk of harm existed and also drew those inferences because he

30

personally saw Eads' physical injuries from his fall.

## VI.  RELIEF REQUESTED

WHEREFORE, Plaintiff requests that this Court grant the following relief:

109.  Declare that Defendant, United States, by and through Counselor Freeman and other B-Left Unit Staff, violated New Jersey law against Negligence.

110.  Declare that Defendant, United States, by and through BOP staff, violated New Jersey law against Negligence.

111.  Declare that Defendant, United States, by and through HSA C. Hansen and other Medical Staff, violated New Jersey law against Medical Malpratice.

112.  Declare that Defendant, United States, by and through HSA C. Hansen, violated New Jersey law against Intentional Infliction of Emotional Distress.

113.  Declare that Defendant, HSA C. Hansen in her individual and/or official capacity violated Plaintiff's Eighth Amendment right to be free from deliberate indifference to a serious medical need.

114.  Declare that Defendant, Lieutenant Wieler in his individual and/or official capacity violated Plaintiff's Eighth Amendment right to be free from deliberate indifference to a serious medical need.

115.  Declare that Defendant, Warden T. Bergami in his individual and/or official capacity violated Plaintiff's Eighth Amendment right to be free from deliberate indifference to a serious

31

medical need.

116.   Declare that Defendant, Unknown Lieutenant in his individual and/or official capacity violated Plaintiff's Eighth Amendment right to be free from deliberate indifference to a serious medical need.

117.   Award compensatory damages against Defendant, United States, for violating New Jersey law against Negligence through the actions of Counselor Freeman and other B-Left Unit Staff.

118.   Award compensatory damages against Defendant, United States for violating New Jersey law against Negligence through the actions of BOP staff.

119.   Award compensatory damages against Defendant, United States for violating New Jersey law against Medical Malpratice through the actions of HSA C. Hansen and other medical staff.

120.   Award compensatory damages against Defendant, United States for violating New Jersey law against Intentional Infliction for Emotional Distress through the actions of HSA C. Hansen.

121.   Award compensatory and punitive damages against Defendant, HSA C. Hansen in her individual and/or official capacity for violating Plaintiff's Eighth Amendment right to be free from deliberate indifference to a serious medical need.

122.   Award compensatory and punitive damages against Defendant, Lieutenant Wieler in his individual and/or official capacity for violating Plaintiff's Eighth Amendment right to be free from deliberate indifference to a serious medical need.

123.   Award compensatory and punitive damages against Defendant, Warden T. Bergami in his individual and/or official capacity for

32

violating Plaintiff's Eighth Amendment right to be free from deliberate indifference to a serious medical need.

124.  Award compensatory and punitive damages against Defendant, Unknown Lieutenant in his individual and/or official capacity for violating Plaintiff's Eighth Amendment right to be free from deliberate indifference to a serious medical need.

125.  Order the United States, BOP, and/or any of its agents and/or employees to refrain from forbidding, sanctioning, disciplining, punishing, and/or transferring Eads for seeking medical attention through the BOP's paper medical sick call system or electronic messages.

126.  Award costs associated with the filing and prosecution of this suit.

127.  Award any other relief this Court deems just and proper.


## VII.  VERIFICATION

128.  I, Christopher Justin Eads, Plaintiff, verify the facts stated in this complaint are true and correct to my knowledge, and that the facts stated on information and belief are true and correct to the best of my knowledge and belief.

_____          Date:___September 29___, 2021

Christopher Justin Eads


Respectfully submitted,

_____          Date:___September 29___, 2021

Christopher Justin Eads


33