Alan Naar, Esq.:  019031976
Meredith C. Sherman, Esq.: 040122009
Mitchell Horner, Esq.:  335302021
GREENBAUM, ROWE, SMITH & DAVIS LLP
99 Wood Avenue South
Iselin, New Jersey  08830-2712
(732) 549-5600
Attorneys for Plaintiff Christopher Justin Eads

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTOPHER JUSTIN EADS,<br><br>            Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA HSA C. HANSEN, WARDEN BERGAMI, LIEUTENANT WIELER, UNKNOWN LIEUTENANTS, and COUNSELOR FREEMAN,<br><br>            Defendants. | No:  1-21-cv-17369-NLH-MJS<br><br>**CIVIL ACTION**<br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff, Christopher Justin Eads ("Plaintiff" or "Mr. Eads"), by way of Second Amended Complaint, says:

## NATURE OF THE ACTION

1.      This is an action seeking relief by way of claims for violation of constitutional rights, including cruel and unusual punishment, negligence, medical malpractice, deliberate indifference to serious medical need, and intentional infliction of emotional distress against Defendant United States of America and its staff at FCI Fairton, which staff included, Defendants HSA C. Hansen, Warden Bergami, Lieutenant Wieler, Counselor Freeman and unknown Lieutenant.

2.      This action arises out of Defendants' negligence and malfeasance relating to Plaintiff's contraction of COVID-19 (due to the institution's failure to implement their stated COVID-19 protocols) and the institution and aforementioned individual's inappropriate and negligent medical care provided for COVID-19 and other health related difficulties suffered by Plaintiff and exacerbated by Defendants, including breathing difficulties, anemia, head trauma, and high blood pressure and blood glucose levels.

3.      This action further relates to Defendants' wrongful assault of Plaintiff and subsequent placement in the Special Housing Unit ("SHU") in retaliation for his Complaints regarding Defendants' failure to provide adequate medical care.  Defendants intentionally inflicted these retaliatory punishments on Plaintiff by assaulting and threatening Plaintiff, and transferring of Plaintiff to the SHU where plaintiff remains in indefinite isolation and is not permitted any interaction with friends, family, or the general prison population, other than two phone calls a month.

4.      Plaintiff seeks an injunction against this continued wrongful contact, to be transferred back to the general population and to receive his legal records and books as well as his needed medication and appropriate medical care on a going forward basis.  Plaintiff also seeks compensatory and punitive damages due to the head trauma and other physical and emotional damages, distress and ailments that resulted from Defendants' wrongful actions.

## JURISDICTION

5.      Jurisdiction of this Court, over the United States of America, is invoked pursuant to 28 U.S.C. § 1346 and the Federal Tort Claims Act.

6.      Jurisdiction of this Court, over HSA C. Hansen, Warden Bergami, Lieutenant Wieler, Unknown Lieutenant, and Counselor Freeman, in their individual and official capacities,

2

for their constitutional violations is invoked pursuant to <u>Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 338 (1971) and 28 U.S.C. §1331.

## **PARTIES**

7.      Plaintiff Christopher Justin Eads is an inmate currently, and at all times relevant hereto, incarcerated at Federal Correctional Institution - Fairton, New Jersey ("FCI Fairton").

8.      Defendant United States of America, at all relevant times hereto, employed staff at the Bureau of Prisons ("BOP") facility, FCI Fairton, which staff included, Defendants HSA C. Hansen ("Hansen"), Warden Bergami ("Bergami"), Lieutenant Wieler ("Wieler"), Counselor Freeman ("Freeman") and unknown Lieutenants (collectively "Defendants.")

## **ADMINISTRATIVE REMEDIES**

9.      Plaintiff has fully exhausted both informal and formal resolution through the administrative remedy and appeals programs of the Bureau of Prisons ("BOP"), but these issues have not been resolved.

## **RELEVANT FACTS**

10.     On March 26, 2020, the BOP implemented "Phase 4" of its COVID-19 pandemic response, which required staff to complete COVID screening and submit to temperature checking.

11.     On or about April 16, 2020, the BOP mandated that all staff and inmates wear masks covering both their nose and mouth.  Three times per day, a message played over the overhead speaker reminding all staff and inmates to wear masks, maintain social distancing, and sanitize and disinfect surfaces.

12.     Despite these clear requirements, Counselor Freeman and several other unit officers openly and fragrantly refused and failed to abide by prison policies, including refusing to wear a mask, refusing to social distance, and refusing to clean and/or disinfect their hands and/or prison

3

surfaces.  Medical staff informed Plaintiff and other inmates that the prison was not carrying out the required testing.

13.     In or around May or June 2020, Counselor Freeman and other staff that routinely worked B-Left Unit where Plaintiff was held tested positive for COVID-19 and introduced it into the inmate population.

14.     On or about June 14, 2020, Plaintiff contracted COVID-19 due to the prison's failure to comply with COVID 19 policies.

15.     Upon contraction of COVID-19, Plaintiff developed breathing complications which made Plaintiff unable to breathe, lightheaded and dizzy.  Plaintiff also repeatedly fainted.

16.     For a period of four months, Plaintiff submitted over a dozen requests for urgent medical treatment due to his COVID-19 breathing complications.

17.     BOP and its staff repeatedly ignored Mr. Eads requests for urgent medical attention and did not provide the required medical care.

18.     In September and October of 2022, Mr. Eads collapsed from breathing complications, which was witnessed by several fellow inmates.

19.     Mr. Eads continued to submit requests to be seen by urgently, but Health Services still did not respond to his requests and provide the required medical treatment.

20.     On October 6, Mr. Eads finally was permitted to see Health Services for his breathing difficulties.  At that visit, it was also determined that Mr. Eads had several additional health issues, including high blood pressure, anemia, and blood sugar issues.

21.     The United States and its staff also failed to provide adequate treatment for Mr. Eads high blood pressure, anemia and blood sugar issues.  In fact, among other things, Mr. Eads did not receive any blood pressure medication until January, during which time Mr. Eads' blood

4

pressure was untreated.  Given his continued dizziness and fainting, Mr. Eads suffered further injury, including head trauma from fainting.

22.	Following his collapse and head trauma, Mr. Eads was threatened by prison staff and told not to seek further medical treatment.  Instead of attempting to secure medical care for Mr. Eads, CSA Hansen, Warden Bergami, Lieutenant Weiler and an unknown lieutenants failed to secure medical care.  Instead, Defendants, including CSA Hansen and Lieutenant Weiler only further taunted and threatened Plaintiff.

23.	Specifically, CSA Hansen cornered Mr. Eads in her office, trapped and would not let him leave, cursed at and verbally abused Mr. Eads, relaying that "I do not care how many requests and emails you submitted for medical attention; your ass will not receive any further medical attention. Now or ever."

24.	Other prison staff reiterated and then carried out this threat.  Specifically, Lieutenant Weiler physically assaulted Mr. Eads causing him further head trauma.

25.	When Mr. Eads continued to attempt to seek medical care by other means, and despite these continued threats,  Mr. Eads' conditions were untreated.

26.	Furthermore, Mr. Eads was retaliated against by being placed in the Special Housing Unit (SHU) as retribution for seeking medical treatment.

## COUNT I

### Negligence of the United States by and through BOP Staff, including B-Left Unit Counselor Freeman and other B-Left Unit Staff.

27.	The United States has a duty under the prevailing case law and 18 U.S.C. §4042 to provide safekeeping for inmates housed in federal facilities such as FCI Fairton.

28.	The United States breached its duty when, among other things, it failed to: (1) provide regular COVID-19 testing for all staff to prevent the introduction of COVID-19 into FCI

5

Fairton; (2) enforce its mask, social distancing and sanitization requirements to prevent the spread of COVID-19 and (3) limit the number if Unit Officers that rotated in and out of B-Left housing unit.

29.     During the summer of 2020, Counselor Freeman and other B-Left Unit Staff contracted COVID-19 and introduced it into the inmate population of B-Left housing unit, including to Plaintiff, who contracted COVID-19 and subsequently began suffering from breathing and other medical complications.  Following its initial negligence, the BOP and its staff continued their negligent conduct in failing to respond or react to Plaintiff's numerous sick calls and email requests.

30.     The United States further breached its duty to Mr. Eads when it failed to provide care after Mr. Eads reported COVID-19 complications despite numerous calls and emails seeking urgent medical attention for his COVID-19 related breathing complications, alerting staff that he could not breathe, was dizzy and faint and needed urgent medical attention.

31.     Mr. Eads submitted numerous requests for medical care through the fall, including but not limited to September 6, 16, 23, 24, and 25, 2020.

32.     The lack of medical attention caused by BOP and its staff repeatedly ignoring Mr. Eads caused Mr. Eads to collapse twice in September and October due to BOP's negligence.

33.     The United States also failed provide appropriate follow-up medical care after they finally conducted a COVID-19 evaluation of Mr. Eads on October 6, 2020.

34.     Mr. Eads was found to have high blood pressure, anemia, and blood sugar issues. Mr. Eads did not receive appropriate medical treatment.

35.     Mr. Eads' blood pressure readings included 148/89 and 197/73, which were extremely high.  Mr. Eads requested follow-up bloodwork relating to his anemia and high glucose, but was not provided an additional blood draw.

36.     On November 23, 2020, Mr. Eads requested care and treatment for his diagnosed anemia, high glucose levels and subsequent COVID-19 breathing issues.  Health Services never responded or evaluated Mr. Eads for his sick call request.

37.     Mr. Eads also repeatedly followed up for blood pressure medication, beginning in late December 2020, which was not provided.  Mr. Eads followed up for blood pressure medication and an additional blood draw numerous times throughout January 2021.

38.     Mr. Eads finally received an alert that his blood pressure medication was ready on January 11 and an appointment for seven months of breathing-related difficulties on January 13.

39.     These delayed appointments and lack of timely medical treatment fell far below the required standard of care.

## COUNT II

### Medical malpractice of the United States by and through
### HSA C. Hansen and other medical staff.

40.     The United States deviated from the standard of care when it failed on many occasions to respond to his medical needs, including failing to respond to his requests for medical care, failing to provide required medication in a timely manner, and failing to provide required follow-up care as noted above and below.

41.     Mr. Eads had blood pressure readings in the Fall of 2022 that were extremely high, i.e., 142/68 (on October 6th), 148/89 (on December 8th) and 197/73 (on December 16th).

7

42.     The applicable standard of care when a patient exhibits high blood pressure is to frequently monitor his blood pressure and prescribe medication to control the blood pressure if it continually registers high.

43.     The United States and its staff deviated from the aforementioned standard of care and further failed to provide the required medication (Lisinopril) for over 3 months.  In fact, the BOP and its staff did not provide communication of filling of his blood pressure prescription until January 11, 2021.  BOP's failure to provide adequate treatment for over 3 months caused Mr. Eads' condition to be exacerbated and caused Mr. Eads to unnecessarily suffer from headaches, dizziness, and fainting.  BOP's malpractice was the proximate cause of Mr. Eads' high blood pressure worsening as it went uncontrolled, resulting in Mr. Eads fainting, and other pain and suffering.

44.     Mr. Eads also had a lab result on November 22nd which showed anemia and high blood glucose.  Because a December 8 lab result showed normal levels, Mr. Eads requested a third lab draw to confirm the results and receive appropriate care.   The United States failed to perform a third blood lab to confirm results and accordingly failed to provide any treatment for anemia and high blood glucose.   The United States' deviation from the standard of care proximately caused complication of anemia such as shortness of breath, and untreated high glucose levels.

45.     The applicable standard of care when a patient reports breathing complications as a result of COVID-19 is to evaluate the patient and prescribe a course of treatment.  The United States deviated from the standard of care when it failed for over 3 months to respond to Mr. Eads sick call requests and emails that he was lightheaded, fainting and suffering from shortness of breath for months between October 2020 and January 2021.  The United States' deviation from the standard of care caused Mr. Eads' breathing complications to continue and worsen.

46. The United States further deviated from the standard of care in retaliating against Plaintiff and threatening him not to seek further medical treatment.

## COUNT III

**Intentional Infliction of Emotional Distress of the United States
by and through HSA C. Hansen**

47. On January 27, 2021, Health Services Administrator ("HSA") C. Hansen called Mr. Eads for an unscheduled visit to castigate him for his repeated requests for medical attention.

48. When Mr. Eads inquired whether he was there to receive medical attention for his repeated requests, HSA C. Hansen acted intentionally, recklessly, and in in deliberate disregard of a high probability that her actions would result in Mr. Eads' emotional distress when she verbally abused Mr. Eads and threatened to (i) deprive him of all future medical care and (ii) place him in the SHU as retaliation.

49. In fact, on January 27, 2021, Mr. Eads was instructed to report to HSA C. Hansen immediately for an unscheduled visit.  HSA C. Hansen did not provide medical attention to Mr. Eads but instead verbally abused him, told him he would not receive any medical treatment, and threatened that if he submitted any additional medical requests, he would be transferred to SHU indefinitely.

50. As Hansen continued to abuse Mr. Eads verbally, Mr. Eads tried to exit Hansen's office. Hansen physically forced the door out of Mr. Eads' hand and shut it again, placing herself between him and the door and keeping him confined in her office.

51. Trapped by Hansen, Mr. Eads begun to suffer a panic attack, i.e. shaking, crying, hyperventilating, and having trouble breathing.

52. Hansen witnessed Mr. Eads' panic attack but did not provide or seek any medical attention for Mr. Eads.  Instead, she continued to verbally abuse and threaten Mr. Eads with

9

punishment of placement into the SHU and transfer to another institution if he ever attempted to seek medical attention again.

53. Several minutes later, Lieutenant Wieler arrived at Hansen's office where he also witnessed Mr. Eads' panic attack, seeing Mr. Eads hyperventilating, having trouble breathing, and shaking and crying.

54. Mr. Eads told Lieutenant Wieler that he required medical attention at the very moment he was having the panic attack. Instead, Lieutenant Weiler ordered Mr. Eads into his office, where he told Mr. Eads that everything Hansen said to him was correct. He stated he would write an incident report for harassment of staff if he ever filed another sick call or medical email request seeking medical attention for any reason and that Eads would be sent to the SHU and transferred to another facility, where he would "not do well."

55. On January 17, 2023, Lt. Weiler directed Eads to report to his office and to place his hands behind his back, handcuffed Eads and then kicked Eads in the back, which sent him crashing into a wall.

56. Lt. Weiler then grabbed Eads' head and slammed it against the wall, which caused a cut on his face and spit in Eads' face.

57. Since being in the SHU, Eads has not received proper medical attention for his injuries caused in the attack by Lt. Weiler, despite filing five (5) medical service requests, due to Hansen's directions that Eads should receive no medical support.

58. CSA Hansen deliberately retaliated and intentionally inflicted emotional distress on Mr. Eads by assaulting him, telling him that he would not receive medical care and would be retaliated against for any further medical requests by being transferred into SHU, directing staff not to provide medical care, and transferring Mr. Eads to SHU without justification.

## <u>COUNT IV</u>

### HSA C. Hansen, Lieutenant Weiler, Warden Bergami, and Unknown Lieutenants were deliberately indifferent to Mr. Eads' serious medical need.

59.     Mr. Eads had a serious medical need before and during his visit with HSA C. Hansen on January 27th, 2021 where he asked for assistance with his breathing issues, light-headedness, dizziness, and fainting spells after contracting COVID-19.

60.     Instead of attempting to provide or secure appropriate medical care for Mr. Eads, Hansen began to curse and verbally abuse Mr. Eads stating that he would never receive medical care, and would be placed in the Special Housing Unit (SHU) and transferred to another institution if he filed another medical sick call or email request seeking medical attention for any reason.

61.     HSA C. Hansen was deliberately indifferent to Mr. Eads' serious medical need when she refused to provide or seek appropriate medical care, verbally abused Mr. Eads and threatened to deny him all further medical attention, threatened to retaliate against him for seeking medical attention by placing him in the Special Housing Unit, and actually did retaliate against Mr. Eads by placing him in the Special Housing Unit as "retaliation" for seeking medical attention.

62.     Hansen's actions were deliberately indifferent because she intentionally refused to provide care, delayed medical treatment for non-medical reasons, and denied reasonable requests for treatment that resulted in  Mr. Eads suffering the risk of further injury and pain.  Hansen's deliberate indifference caused further medical damages to Mr. Eads because on January 27, 2021 because Mr. Eads could not breathe and suffered a panic attack during Hansen's threats.

63.     Mr. Eads also relayed his concerns to Lieutenant Wieler who witnessed Mr. Eads hyperventilating, struggling to breathe, shaking and crying and continued to verbally abuse Mr. Eads and withhold any medical treatment.

64.     Lieutenant Wieler also demonstrated deliberate indifference to serious medical needs in denying medical treatment to Mr. Eads and engaging in the same threats that Hansen made of SHU placement and transfer to another facility.  Lieutenant Weiler intentionally refused to provide care, delayed medical treatment for non-medical reasons, and denied reasonable requests for treatment that resulted in Mr. Eads suffering the risk of further injury and pain.

65.     On January 28, 2021 and again on February 1, 2021, Mr. Eads personally hand delivered an Administrative Remedy request to Warden Bergami and also relayed the threats by HSA Hansen and Lieutenant Wieler prohibiting Mr. Eads from seeking further medical attention.

66.     On January 31, 2021, at approximately 6:00pm, while taking a shower, Mr. Eads experienced difficulties breathing, saw spots, got light-headed and dizzy and subsequently lost consciousness.  When Mr. Eads lost consciousness, Mr. Eads hit his face and head on an unknown fixture or object in the shower.  After an unknown amount of time (approximately 30-45 minutes), covered in blood and nauseous.  Mr. Eads lay on the floor for an additional 15 or so minutes and then stumbled to his cell, where he discovered a large bloody knot on the side of his head which was still bleeding.

67.     Due to the threats from HSA Hansen and Lieutenant Wieler, Mr. Eads feared retaliation if he were to submit a medical request.

68.     On February 1, 2021, Mr. Eads hand delivered another Administrative Remedy request to Warden Bergami regarding his January 31, 2021 medical situation in the shower.  Warden Bergami personally witnessed Mr. Eads' head trauma and injuries, as Mr. Eads removed his bandages and showed him visible injuries. Mr. Eads requested medical attention and advised Warden Bergami that he was not allowed to file a sick call or medical email message due to the

12

threats of punishment. Warden Bergami took Mr. Eads' "sensitive" Administrative Remedy request from him, but did not seek medical attention for Mr. Eads.

69.    On February 4, 2021, Mr. Eads sent an email message to Warden Bergami to follow-up about Mr. Eads' fainting in the shower and informed him again of the injuries and the need for medical attention. Warden Bergami's actions were also deliberately indifferent to Mr. Eads' medical needs and he never responded to the February 4, 2021 email message.

70.    On February 6, 2021, Mr. Eads made a telephone call to his family informing them of the incident.  His inability to form words or complete coherent sentences during the call worried his family.  About 30 minutes later, Mr. Eads was instructed to report to the Lieutenant's Office where he was questioned about the telephone call he had just made to his family. The Lieutenant on duty advised Mr. Eads that he had monitored his telephone conversation and needed to document the incident and extent of his visual injuries. The Lieutenant took several photographs of Mr. Eads' head trauma and injuries and made a report.  Mr. Eads requested that the Lieutenant seek medical attention for him because he was afraid to file medical sick call or email message requests due to the threats previously made by HSA Hansen and Lieutenant Wieler. However, the Lieutenant sent Mr. Eads back to his housing unit without seeking him medical attention for the visible injuries documented by the Lieutenant.  Unknown Lieutenant was deliberately indifferent to Mr. Eads' serious medical need when he failed to take any action to provide any kind of medical attention or support to Mr. Eads, after: he listened to Mr. Eads' phone call with Mr. Eads' family, heard that Mr. Eads could not formulate words or complete, coherent sentences, took photographs or Mr. Eads' injuries, and heard Mr. Eads' complaints about pain and lack of medical attention. Unknown Lieutenant knew that sending Mr. Eads back to his housing unit would result in no medical care being provided to Mr. Eads.

71.     On February 8, 2021, Mr. Eads filed an additional Administrative Remedy request seeking medical attention for his head trauma and injuries from the January 31, 2021 shower fall, since he could not do so by medical sick call request.  Warden Bergami told Mr. Eads to seek medical attention through the medical department, despite the known threats by HSA Hansen and Lieutenant Wieler. Mr. Eads informed Warden Bergami of his breathing issues, light-headedness, dizziness, and fainting spells after contracting COVID-19, as well as his head trauma and loss of consciousness in the shower.

72.     Bergami was also aware that Mr. Eads had submitted numerous medical requests that were all unanswered and that Mr. Eads was threatened with retaliation for seeking medical treatment.

73.     Bergami's actions were deliberately indifferent because he delayed medical treatment for non-medical reasons and denied reasonable requests for treatment that resulted in Mr. Eads suffering the risk of further injury and pain.

74.     Bergami knew of and disregarded an excessive risk to Mr. Eads even though he was personally made aware of Mr. Eads' breathing issues, lightheadedness, seeing spots, dizziness and passing out, and personally saw Mr. Eads' injuries from the fall.

75.     Mr. Eads continues to seek medical attention, but all of his requests go unanswered, or he is punished for them.  Mr. Eads is afraid to file further requests.  The retaliation and failure to provide medical care shows an extreme disregard of Mr. Eads' serious medical needs. Lieutenant Weiler then escalated his retaliation against Mr. Eads when he assaulted Eads in January of 2023.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that this Court grant the following relief:

76.     Declare that Defendant, United States, by and through Counselor Freeman and other B-Left Unit and BOP Staff, committed negligence;

77.     Declare that Defendant, United States, by and through HSA C. Hansen and other Medical Staff, committed medical malpractice;

78.     Declare that Defendant, United States, by and through HSA C. Hansen, intentionally and unlawfully inflicted emotional distress upon Mr. Eads;

79.     Declare that Defendant, HSA C. Hansen, Lieutenant Wieler, Warden Bergami, and unknown Lieutenants, in their individual and/or official capacity violated Plaintiff's constitutional rights, including his Eighth Amendment right to be free from deliberate indifference to a serious medical need;

80.     Award compensatory damages and punitive damages against Defendants;

81.     Award costs, attorneys' fees, and all other relief that the Court deems just and proper.

Respectfully submitted,

GREENBAUM, ROWE, SMITH & DAVIS LLP
Attorneys for Plaintiff, Christopher Justin Eads

Dated: February 8, 2024                    By:  /s/Meredith C. Sherman _____
                                                 Meredith C. Sherman

15